NOT DESIGNATED FOR PUBLICATION

No. 120,471

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of F.C., A.C., L.D.C., L.J.C., and D.C.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; GREGORY D. KEITH, judge. Opinion filed August 9, 2019.
Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant natural
mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON and GARDNER, JJ.

PER CURIAM: C.H. (Mother) appeals the ruling of the Sedgwick County District
Court terminating her right to parent her five children, F.C., A.C., L.D.C., L.J.C., and
D.C. She contends the State produced insufficient evidence that she was an unfit parent,
particularly related to her youngest child, D.C., who was born after the petition was filed
to terminate her parental rights as to the other four. But the evidence established Mother
continued to use methamphetamine, ignored or delayed completing court orders, lacked
regular employment, and had no plan to dissolve her relationship with F.C.C. (Father)
despite his abuse and no-contact orders. We find no legal or factual error in the district
court's decision and affirm.

1

Mother was living with Father and the couple's four children when the Kansas Department for Children and Families (DCF) received multiple reports about the children. These concerns included: domestic violence incidents involving law enforcement; Mother's failure to seek medical treatment for L.J.C. after finding bruising and swelling on the child's head after the child was in Father's care; Mother repeatedly leaving the children in Father's care despite his history of domestic violence; Mother returning to live with Father after he had strangled her and injured L.J.C.; and both parents' using methamphetamine around the children.

After receiving these reports, DCF intervened in early March 2017 and took protective custody of the four children. The State then filed a petition in the district court to have each child declared a child in need of care. The district court held a temporary custody hearing the next day and found there was probable cause to believe that the health or welfare of the children may be endangered without further care and that it was in the best interests of the children to remain in the temporary custody of DCF in an out-of-home placement. The court also ordered Father to have no contact with Mother and no contact with the children until he completed a clinical assessment and domestic violence classes.

Almost two months after the petition was filed, the district court adjudicated the children to be children in need of care and continued their assignment to out-of-home placement. In June 2017, Mother developed a reintegration plan with Saint Francis Community Services (SFCS) with the goal of returning the children home by August. But the district court subsequently held a permanency hearing and found that family reintegration was no longer a viable goal.

In September 2017, six months after the children were removed from the home, the State moved to terminate Mother's parental rights as to F.C., A.C., L.D.C., and L.J.C. In December 2017, Mother gave birth to another child, D.C. Two days after her birth, D.C. was placed in police protective custody, and the State filed another child in need of care petition and motion for termination for D.C. The district court held an adjudication hearing for D.C., determined she was a child in need of care, and ordered her placed in DCF custody.

The district court held an evidentiary hearing on the termination motions in April 2018.

At trial, the district court found by clear and convincing evidence that Mother was statutorily unfit by reason of conduct or condition that rendered her unable to care properly for her children. The district court similarly found that those conditions were unlikely to change in the foreseeable future and that the children's best interests would be served by terminating Mother's parental rights. The district court relied on four factors to make its decision: Mother's use of intoxicating liquors or narcotics or dangerous drugs before and throughout this case under K.S.A. 2018 Supp. 38-2269(b)(3); the failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family under K.S.A. 2018 Supp. 38-2269(b)(7); Mother's lack of effort in adjusting her circumstances, conduct, or conditions to meet the needs of the child under K.S.A. 2018 Supp. 38-2269(b)(8); and Mother's failure to carry out her reintegration plan under K.S.A. 2018 Supp. 38-2269(c)(3). Mother has appealed, challenging the sufficiency of the evidence supporting each determination.

ANALYSIS

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L.

3

Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the law deems this right to be fundamental. The State may therefore extinguish the legal bonds between parent and child only upon clear and convincing evidence of paternal unfitness. K.S.A. 2018 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2018 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2018 Supp. 38-2269(b). The statute lists four other factors to be consider if a parent no longer has physical custody of a child. K.S.A. 2018 Supp. 38-2269(c).

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. Thus, we are to resolve any conflicts in evidence to the State's benefit and against Mother.

Here, as we have pointed out, the district court found Mother to be unfit based on four statutory grounds set forth in K.S.A. 2018 Supp. 38-2269(b)(3), (b)(7), (b)(8), and (c)(3). Any single factor under the statute, standing alone, may establish grounds for termination. K.S.A. 2018 Supp. 38-2269(f). We will next examine the evidence supporting the grounds the district court cites under each statutory provision.

4

*There is clear and convincing evidence to support the district court's finding that Mother's use of drugs was such as to render her unable to care for the ongoing needs of her children.*

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence of the "use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." K.S.A. 2018 Supp. 38-2269(b)(3). Here the evidence supports such a finding.

Mother used methamphetamine before and throughout the case. Mother admitted to using methamphetamine for six months after DCF placed her children in custody and continued to use methamphetamine after she reported she was four months pregnant. Mother did not know that using methamphetamine while pregnant would affect her unborn child. Mother failed to comprehend the risk she was putting her children in by using methamphetamine while pregnant.

Eight months after her children were placed in DCF custody, Mother completed intensive outpatient treatment. Mother's continuing care program discharged her in April 2018, even though she still submitted positive and invalid drug test results and there was evidence of her poor attendance and lack of engagement in the classes.

At the termination hearing, Mother testified the result of the most recent positive test, in March 2018, was wrong because she had not been using methamphetamine. Mother suggested the positive test came from the antidepressants she was taking. She presented no evidence about the medications she was taking. The test result simply showed positive for amphetamines. But she had no explanation for the diluted test two weeks later. Mother asserts that the evidence was particularly lacking over parenting of her newborn baby, D.C. Mother argues she quit using methamphetamine and had

5

completed her treatment before D.C. was born. But the evidence establishes that she submitted two tests, one positive for amphetamines and one diluted, well after the birth of D.C. As for the truth and veracity of Mother's claims about her drug usage, the district court judge apparently did not believe her. As noted, we must examine the evidence in the light most favorable to the State. We do not weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

Finally, Mother urges us to disregard testimony of the social worker because she was not qualified as an expert witness. But the social worker did identify herself as a licensed permanency specialist and a licensed social worker. Moreover, there was no objection lodged at the trial to her qualifications. Mother cannot, for the first time on appeal, complain about evidence that she did not object to during trial. See K.S.A. 60-404 (requiring a timely and specific objection to admission of evidence at trial to preserve issues on appeal).

*There is clear and convincing evidence to support the district court's finding that reasonable efforts made to rehabilitate the family failed.*

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence that the reasonable efforts made by the State to rehabilitate the family have failed. K.S.A. 2018 Supp. 38-2269(b)(7). Here, the district court ordered Mother to complete various tasks which Mother either delayed in completing or ignored altogether. As mentioned, Mother did not follow court orders when she failed to abstain from using methamphetamine. Mother also did not maintain employment, and instead she started and quit three temporary jobs throughout this case because she did not like them. Mother completed a substance abuse evaluation and followed the recommendations, yet it took her five months to begin treatment and she tested positive for the use of amphetamines after treatment. Mother had not enrolled in a budget class until right before

6

her termination hearing. She waited 6 months to attend domestic violence classes, waited 7 months for a clinical counseling evaluation, and waited 10 months to begin attending therapy. Mother admitted to ignoring the no-contact orders and admitted to having her driver's license suspended after she failed to deal with outstanding traffic cases. Mother acknowledged that she could go to jail in one of the traffic cases and had a warrant out for her arrest after failing to pay child support and failing to appear in court. These examples show that although the State made reasonable efforts to rehabilitate the family, Mother was not willing to follow through on court orders.

*There is clear and convincing evidence to support the district court's finding that Mother failed to adjust her circumstances, conduct, or conditions to meet the needs of her children.*

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence the parent has failed to adjust his or her circumstances, conduct, or conditions to meet the needs of the children. See K.S.A. 2018 Supp. 38-2269(b)(8). This is most evident in Mother's inability to recognize the risk she was putting herself and her children in by continuing to remain in a relationship and live with Father throughout most the pendency of this case.

In February 2017, Mother filed a protection from abuse from Father in which she alleged Father tried to kill her by strangulation and "brutally punched" their 4-month-old child, L.J.C. Even so, Mother continued to live with Father and attempted to have the no-contact order lifted in December 2017. Mother completed domestic violence classes, yet she told a permanency specialist that she did not believe her relationship with Father was toxic. She chose to live with Father regardless of the no-contact orders issued by two courts. Mother admitted she only stopped living with Father because he was incarcerated in November 2017. Mother had no plans to quit living with Father because she still had feelings for him and it was difficult for her to say no to him. The permanency specialist

testified that Mother failed to recognize the risk she was putting her children in by continuing to live with the abusive father. While we recognize that the federal government has deported Father and he is not currently in Mother's life, the evidence shows that Mother would still be with Father had he not been deported. This indicates that when it came to her intimate relationship with a man, she was not willing to put her children ahead of her relationship.

Mother also could not put the financial needs of her family ahead of her dislike of employment. Mother had sporadic employment throughout the case, which would make it difficult to provide financially for herself and her seven children. Mother testified that she worked a temporary job from January 2017 to March 2017 and then from August 2017 to February 2018, but she quit because of the pay. The next month, Mother got another job but quit after three days because she did not like it. A couple of weeks before the evidentiary hearing, Mother quit another temporary job because it was too hot in the building. Mother testified that having no job was better than having a job she did not like, she lived off her tax return, and her husband paid the rent during her periods of unemployment. That said, Mother started a new job four days before the start of the evidentiary hearing. Mother testified that this job paid $12 an hour and that she enjoyed the job. But again, Mother's belief that having no job was better than having a job she did not like placed her needs above those of her children.

*There is clear and convincing evidence to support the district court's finding that Mother failed to carry out a reasonable plan directed toward integrating the children into the parental home.*

The district court's finding that Mother failed to carry out a reasonable plan directed toward reintegration was supported by the evidence. See K.S.A. 2018 Supp. 38-2269(c)(3). Mother displayed a lack of effort on following through on many reintegration tasks. Mother did not prioritize visits with her children, attending some, but not all, of her

8

offered visits with her children. And SFCS never felt comfortable moving these visits beyond supervised. Mother had poor communication with her SFCS worker and attended less than half of the worker/parent meetings throughout the case because she had errands to run or other things to do.

In sum, based on our review of the full evidentiary record considered in a light favoring the State, we conclude a rational fact-finder could determine to a high probability that Mother was unfit to parent these five children at the time of the termination hearing in the ways the district court identified. We find support for the district court's determination that Mother's unfitness was unlikely to change in the foreseeable future. The evidence showed that while Mother completed many of the reintegration tasks, Mother continued to use methamphetamine, failed to follow court orders, and admitted that had Father not been deported she had no plans to quit living with him regardless of his abuse and the no-contact orders.

In gauging the foreseeable future, the court should use "child time" as the measure. As the Revised Kansas Code for Care of Children, K.S.A. 2018 Supp. 38-2201 et seq., recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult. This different perception typically points toward a prompt, permanent disposition. See K.S.A. 2018 Supp. 38-2201(b)(4); see also *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's"). Here, that factor takes on particular significance given the very young age of all the children who have been in custody much of their entire lives.

*The district court did not abuse its discretion in finding that termination of Mother's parental rights was in the best interests of her children.*

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child." K.S.A. 2018 Supp. 38-2269(g)(1). The district court gives "primary consideration to the physical, mental[,] and emotional health of the child." K.S.A. 2018 Supp. 38-2269(g)(1). The district court makes that decision based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. This decision is within the sound discretion of the district court, and an appellate court reviews this decision for an abuse of discretion. 50 Kan. App. 2d at 1115-16. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representation, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

We find no shortcomings in the district court's assessment of the evidence or applicable legal principles. We now simply ask whether no reasonable district court would come to the same conclusion under comparable circumstances. We believe other district courts would come to the same conclusion. Here, as we have stated, the evidence shows Mother could not provide stability for her children as she failed to address her relationship with Father, placing her children in immediate danger. She failed to maintain long term employment, preferring no job to one she did not like. And she continued to struggle with her addiction to methamphetamine. As a direct result, Mother's five children were in the custody of the State and the foster care system for a large portion of their lives.

We find the district court acted within the evidence and the law in terminating Mother's parental rights related to F.C., A.C., L.D.C., L.J.C, and D.C.

10

Affirmed.